

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 05-21550-CIV-KING/GARBER

PAUL R. MARCUS,

        Plaintiff,

vs.

GARLAND, SAMUEL & LOEB, P.C. and
EDWARD T.M. GARLAND,

        Defendants.

_____/

## DEFENDANTS GARLAND, SAMUEL & LOEB, P.C.
## AND EDWARD T.M. GARLAND's MOTION FOR FINAL
## SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendants, Garland, Samuel & Loeb, P.C. and Edward T.M. Garland, move, pursuant to

Rule 56, Federal Rules of Civil Procedure, and Rule 7.5, Local Rules of the Southern District of

Florida, for final summary judgment on the following grounds.

Plaintiff, Paul Marcus, a Florida attorney residing in Miami, alleges he made an oral

agreement with Edward T.M. Garland, an attorney in Atlanta, Georgia, of the law firm Garland,

Samuel & Loeb, P.C., ("GSL"), that he (Plaintiff) would be paid one-third of the fees received

by GSL for representing a person Plaintiff alleged to be "his client" in a criminal case in the

Middle District of Florida. The Defendants deny that such an agreement was ever made, and that

the client in question, Jerome Jacobson, was ever Plaintiff's client.    There is nothing

memorializing the terms of the alleged agreement; no witnesses to its allegedly being made

except for Plaintiff; nor was such an agreement ever communicated to the client, Mr. Jacobson.



FERRELL

Plaintiff played no role in representing Jerome Jacobson in his case, and for that matter never even spoke to him about it.

Defendants asserted various affirmative defenses, including defenses that the alleged oral agreement violated applicable ethical rules, and was illegal, unethical, and unenforceable; and unenforceable under the statute of frauds. Based on undisputed material facts, including the admissions of the Plaintiff, and accepting the Plaintiff's version of the events as true for purposes of this Motion, there is no genuine issue as to any material fact, and Defendants are entitled to final summary judgment as a matter of law on its affirmative defenses, because:

1. The alleged oral agreement that Plaintiff claims he made with Mr. Garland calls for a percentage division of a client's fee, not based upon the proportion to the services performed, which was not made by written agreement with the client disclosing the division of fees and the basis upon which it was made. The asserted agreement therefore violates Rule 4-1.5(g) of the Rules of Professional Conduct regulating members of the Florida Bar, and is void as against public policy and unenforceable; and

2. The agreement Plaintiff asserts he made with Mr. Garland was that he would participate in the representation of Mr. Jacobson throughout the case, including post-trial proceedings and any appeal. The alleged oral agreement was thus intended to last for more than one year, and therefore the agreement is barred by Section 725.01, Florida Statutes (the "statute of frauds").

## MEMORANDUM OF LAW

## STATEMENT OF MATERIAL FACTS

Pursuant to Rule 7.5.C. of the Local Rules of this Court, the following are the material facts for purposes of this motion for summary judgment.



1. Jerome Jacobson was charged with a crime in case number styled <u>USA v. Jacobson, et al.</u>, case number 3:01-cr-00251-HLA-MCR-1. Jerome Jacobson affidavit, **Exhibit 1**, at ¶ 3.[1]

2. This was a major case with complex facts and multiple defendants. Garland affidavit, **Exhibit 2**, at ¶ 4.

3. The case in which Plaintiff was charged was pending in the Middle District of Florida. February 3, 2006 deposition of Plaintiff Paul Marcus at 100:117-19[2], excerpts attached as **Exhibit 3**.

4. Jerome Jacobson retained Defendant Edward T.M. Garland to represent him on August 23, 2001 in that case. Jerome Jacobson affidavit at ¶¶ 7, 9; Garland affidavit at ¶ 3.

5. The retainer agreement between Mr. Jacobson and Mr. Garland's firm contemplated representation in the criminal case as well as any related forfeiture action. Garland Affidavit, ¶ 8 (Exhibit A).

6. Plaintiff is an attorney licensed to practice in the State of Florida and is a resident of Miami-Dade County. Compl., ¶ 2.

7. Plaintiff acknowledges that the Florida Rules of Professional Conduct apply to him -- "whatever [he does.]" 130:21-24.

8. Plaintiff alleges that he made an oral agreement with Mr. Garland that Plaintiff would be paid 1/3 of the fees Mr. Garland's firm received representing Mr. Jacobson. Complaint, **Exhibit 4, ¶ 7**.

---

[1] Because of logistical issues, the original copies of the affidavits were not received at the time this Motion was filed. The original copies of the affidavits will be filed separately.

[2] The deposition of Plaintiff Paul Marcus is cited repeatedly throughout this motion, in the form xx:yy where xx is the page number and yy are the line numbers. All such citations refer to Mr. Marcus' deposition testimony, unless specified otherwise.


FERRELL

9. Defendants deny that any such agreement to share fees was made.  Garland affidavit at ¶¶ 5, 6.

10. The person identified in the complaint as "Plaintiff's client" (e.g. ¶ 7) is Jerome Jacobson.  36:11-37:11.

11. Neither Jerome Jacobson, nor his wife, Linda, have ever been clients of Plaintiff. Jerome Jacobson affidavit at ¶ 11; Linda Jacobson affidavit, **Exhibit 5**, at ¶ 10; 45:14-46:10; 47:20-24.

12. Plaintiff never spoke to Jerome Jacobson regarding the case in which he was charged, and never attempted to call him. 24:5-16; Jerome Jacobson affidavit at ¶ 12.

13. There was no written agreement with Jerome Jacobson or Linda Jacobson regarding the fee division agreement Plaintiff alleges he made with Mr. Garland.  Jerome Jacobson affidavit at ¶ 14; Linda Jacobson Affidavit at ¶ 11; Garland affidavit at ¶¶8, 9; 134:5-8.

14. Plaintiff never spoke to Jerome Jacobson about the alleged agreement with Mr. Garland to divide fees.  124:5-16; Jerome Jacobson affidavit at ¶ 14.  Nor did he tell Mr. Jacobson's wife about any such arrangement. 124:17-21; Linda Jacobson affidavit at ¶ 11.

15. Plaintiff never spoke to Jerome Jacobson regarding Plaintiff's alleged role in representing him. 47:20-24; 124:5-16; Jerome Jacobson affidavit at ¶ 13.

16. Other than Mr. Marcus and Mr. Garland, there are no witnesses to the conversation in which Plaintiff alleges a fee division agreement was made. 112:12-16; 113:11-16.

17. Plaintiff is not a criminal defense attorney. 22:25-23:5.  He was not practicing criminal defense law at the time of the alleged fee division agreement with Mr. Garland.  100:14-16.

18. Plaintiff has practiced family and divorce law for the last 25 years.  22:16-24.



19. Plaintiff is not familiar with basic concepts of Federal criminal procedure.  23:21-24:18.

20. Plaintiff has never represented a defendant in a Federal court trial.  24:23-25.

21. Plaintiff is not admitted to practice in the Middle District of Florida.  17:10-12; 100:17-19.

22. Plaintiff's activities relating to Mr. Jacobson's case consisted of sending Mr. Garland a couple newspaper articles, reading local papers, and conversations with Marvin Braun (a co-defendant) and possibly Mr. Braun's attorney, the Honorable Theodore Klein (then in private practice). 142:22-143:5.

23. Marcus expected remuneration for a referral even if there was no participation.  82:9-10.

24. Plaintiff kept no records of the amount of time he spent on the Jacobson case. 143:1-144:5.

25. Plaintiff intended his involvement or participation in Mr. Jacobson's case to be for the duration of the case, including trial and appeal, from beginning to end. 106:25-108:1.

26. Mr. Garland and Mr. Jacobson and his wife understood that this was a significant matter that was expected to last for more than one year, and, indeed, might take years for the trial and appeal.  Garland affidavit at ¶ 4; Jerome Jacobson affidavit at ¶ 7; Linda Jacobson affidavit at ¶ 9.

27. Plaintiff understood the Jacobson matter was a substantial case.  64:10-24; 91:25-92:14.

28. Mr. Garland's representation of the client continues to this day.  Jerome Jacobson Affidavit at ¶ 16.



## ARGUMENT

### 1. **Plaintiff's Alleged Oral Contract Violates The Rules Of Professional Conduct And Is Therefore Void And Unenforceable.**

The alleged oral agreement Plaintiff claims he made with Mr. Garland was that Mr. Garland and his firm would give Plaintiff one-third of the fees GSL received for representing Jerome Jacobson in a criminal case filed in the Middle District of Florida. The oral agreement alleged by Plaintiff violates the Rules of Professional Conduct regulating Florida lawyers, is against public policy, and is therefore void and unenforceable.

The Rules of Professional Conduct apply to all lawyers licensed to practice in Florida. Plaintiff is a lawyer practicing in Florida. Compl. at ¶ 2. Rule 1-10.1 requires that all members of the Florida Bar comply with the terms and the intent of the Rules of Professional Conduct. Thus, Plaintiff is governed by the Rules of Professional Conduct.[3]

The Florida Rules of Professional Conduct contain explicit rules governing attorney fee arrangements.[4] These rules are set out (among other places) in Rule 4-1.5, titled "Fees and Costs of Legal Services." Subdivision (g) of Rule 4-1.5 is titled: "Division of Fees Between Lawyers in Different Firms." It states as follows:

---

[3] Plaintiff admitted the Florida Rules of Professional Conduct apply to him. 130:21-24.

[4] Attorney referral fee and fee sharing rules were amended by the Florida Bar in 1987, following a Board of Governors special commission studying contingent fees and referral practices. Amendments were deemed necessary in part to "to clarify standards by which reasonable legal fees are to be determined and to set limits on referral fees." *In re Amendments to the Rules Regulating the Florida Bar*, 519 So. 2d 971, 972 (Fla. 1987). The Court stated in this respect: "We have received comments from several bar members and a trial lawyers' group regarding these amendments. The concerns expressed include claims that referral fees are not being abused, that the proposals discriminate by placing restrictions on the right to employ attorneys, and that the proposed amendments will increase brokering rather than restrict it. We acknowledge these concerns, but we believe that there should be some regulation of the brokering of cases and that these proposed amendments are a start toward reaching that end."



Subject to the provision of subdivision (f)(4)(D)[5] a division of fee between lawyers who are not in the same firm may be made only if the total fee is reasonable, and:

(1) The division is in proportion to the services performed; or

(2) By written agreement with the client:

(A) Each lawyer assumes joint legal responsibility for the representation and agrees to be available for consultation; and

(B) The agreement fully discloses that a division of fees will be made and the basis upon which the division of fees will be made.

The Comment to Rule 4-1.5(g) further explains:

**Division of fee**

A division of fee is a single billing to a client covering the fee of 2 or more lawyers who are not in the same firm. A division of fee facilitates association of more than 1 lawyer in a matter in which neither alone could serve the client as well, and most often is used when the fee is contingent and the division is between a referring lawyer and a trial specialist. Subject to the provisions of (f)(4)(D), subdivision (g) permits the lawyers to divide a fee on either the basis of the proportion of the services they render, or by agreement between the participating lawyers if all assume responsibility for the representation as a whole and the client is advised and does not object. It does require disclosure to the client of the share that each lawyer is to receive. Joint responsibility for the representation entails the obligations stated in rule 4-5.1 for purposes of the matter involved.

Rule 4-1.5(g) was addressed by the Florida Supreme Court in *The Florida Bar v. Carson*, 737 So. 2d 1069 (Fla. 1999), a disciplinary proceeding. The facts of *Carson* are as follows: Carson, a Florida attorney, claimed he referred clients to another attorney, and that he had an oral referral fee agreement with the other attorney for 25% of the fees earned. *Id.* at 1071. When the other attorney did not pay, Carson sued him and referred him to the Florida bar. *Id.* The Florida

---

[5] This subdivision 4-1.5(f)(4)(D) is found in part (f), which also contains rules applicable in contingency fee cases. Subdivision (4) of part (f) relates to arrangements for fees "in an action or claim for personal injury or property damages or for death or loss of services resulting from personal injuries based upon the tortious conduct of another" where there is a contingency fee arrangement. Subdivision (D) of (f)(4) relates to division of fees in such cases, and is thus not applicable here, as this was not a case involving personal injury or property damage, nor a contingency fee case.



05-21550-CIV-KING/GARBER

Bar instead brought a disciplinary proceeding against Carson, for violating the ethical rules. *Id.*

The complaint filed by the Bar alleged that Carson performed no services in the cases referred,

and that none of the clients had ever agreed in writing to the payment of a referral fee to Carson.

*Id.*

As the referred cases were contingent fee cases, the Bar charged Carson with violating

Rule 4-1.5(f)(2), which deals specifically with contingency fee cases. *Id.* at 1070. Analyzing the

case, the Court found that Carson had also violated Rule 4-1.5(g), stating:

> We find that a fair reading of this rule [4-1.5(g)] supports a conclusion that it has been violated where, as here, an attorney enters into an oral agreement to divide the fee and pursues collection of the fee despite the fact that the agreement was never reduced to writing, the client never consented in writing to such a fee and no responsibility for the case was assumed. Rule 1-10.1 states that "all members of The Florida Bar shall comply with the terms and the intent of the Rules of Professional Conduct as established and amended by this court," (emphasis added) and Rule 3-4.3 provides:
>
> > The standards of professional conduct to be observed by members of the bar are not limited to the observance of rules and avoidance of prohibited acts, and the enumeration herein of certain categories of misconduct as constituting grounds for discipline shall not be deemed to be all-inclusive nor shall the failure to specify any particular act of misconduct be construed as tolerance thereof.
>
> As we stated in *Florida Bar v. Rubin*, 709 So. 2d 1361, 1364 (Fla. 1998), "this Court expects strict compliance with . . . rules requiring a client's written consent to an attorney's fee regardless of the circumstances involved. These requirements must be diligently adhered to and enforced in order . . . to preserve public confidence in the legal profession." *See also Chandris, S.A. v. Yanakakis*, 668 So. 2d 180, 185-86 (Fla. 1995) (holding that a contingent fee agreement that is not in compliance with the Rules of Professional Conduct is void as against public policy and not enforceable). It was undisputed that Carson performed no legal services in the case, there was no written agreement for a referral fee, and the client never consented in writing to a referral fee.

*Id.* at 1072.

Thus, Rule 4-1.5(g) requires that any division of fees between lawyers of different firms

that is not based upon the services performed must be in a written agreement with the client,



advising him of the division and the basis for the division, and both lawyers must take legal

responsibility for the representation.[6]  The Florida Supreme Court has made it clear that the rule

must be strictly complied with and the requirement of a written agreement must be adhered to

diligently; completely to the contrary of what Plaintiff is alleging here.

### A. **The Claimed Oral Agreement to Divide Fees on a Percentage Basis Violates the Rules of Professional Conduct.**

Plaintiff avers that "it was agreed that Plaintiff's participation fee would be one-third of the

fee Plaintiff's client[7] paid to Defendants."  Compl. ¶ 7.  It is clear that the oral agreement

Plaintiff is alleging violates the ethical rules.  By the vary nature of the agreement Plaintiff

alleges was made – that he would receive a fixed percentage (1/3) of the fees regardless of the

actual proportion of the services rendered – it could not be, by definition, a division "in

proportion to the services performed by each lawyer" permissible under Rule 4-1.5(g)(1) without

a written agreement with the client.[8]  Plaintiff is not seeking fees for the services he performed;

---

[6] The fact that Plaintiff made the alleged unethical oral agreement with an out-of-state attorney does not alter Plaintiff's obligations to comply with the Florida attorney fee rules, or change the result of the failure to comply.  *E.g. State Contr. & Engg Corp. v. Condotte Am., Inc.*, Case No. 97-7014-CV-Dimitrouleas/Torres, 2004 U.S. Dist. LEXIS 28600, *62, n.15 (S.D. Fla. 10/24/2004) (oral contingent fee contract with out-of-state lawyer was never reduced to writing; the contract was *void ab initio* as an illegal contract) (*citing Vista Designs, Inc. v. Melvin K. Silverman, P.C.*, 774 So. 2d 884, 886 (Fla. 4th DCA 2001).

[7] The premise upon which Plaintiff could allege that Mr. Jacobson was "his client" (Compl. ¶ 7) is unfathomable.  Neither the client, Jerome Jacobson, nor his wife, Linda, have ever been clients of Mr. Marcus.  See Jerome Jacobson affidavit at ¶ 11; Linda Jacobson affidavit at ¶ 10.  They hardly even know him.  *Id.*  Mr. Marcus was not retained by Mr. Jacobson for this or any other matter.  45:14-46:10.  He was not able to describe Mr. Jacobson in detail.  48:10-12.  In fact, he never even spoke to the person he calls "his client" regarding his case, or regarding Plaintiff's purported role in representing him.  47:20-24; 124:5-16.

[8] Even were Plaintiff claiming an agreement whereby Mr. Garland agreed to Plaintiff's participation, it is hard to see how the parties could have contemplated that Plaintiff could have performed 1/3 of the services required.  Plaintiff was not a criminal defense attorney, 22:25-23:5, and was not practicing criminal defense law.  100:14-16.  He has practiced family and



nor is he asserting that he performed 1/3 of the services performed.[9]  Rule 4-1.5(g)(1) therefore does not apply.   *See Halberg v. Chanfrau,* 613 So. 2d 600, 602 (Fla. 5th DCA 1993) (oral agreement to share fees 75% - 25% did not fall under Rule 4-1.5(g)(1), even though agreement provided that such fees may be adjusted based upon the extent of time and services rendered to the client).

As the alleged oral 1/3 fee sharing agreement did not fall within Rule 4-1.5(g)(1), it was required to comply with 4-1.5(g)(2): it had to be a written agreement with the client, with each lawyer assuming joint legal responsibility and agreeing to be available for consultation with the client, and the written agreement had to fully disclose the division of fees that would be made, and the basis upon which division of fees were to have been made.   There is no dispute that Rule 4-1.5(g)(2) was not complied with here.   There was no written agreement with the client regarding this alleged fee sharing agreement; the client never heard of any such agreement, and for that matter did not know that Mr. Marcus had any role in the case.  Jerome Jacobson affidavit

---

divorce law for the last 25 years.  22:16-24.   He is not familiar with even basic concepts of criminal procedure.  23:21-24:18.  He had never represented a defendant in a Federal court trial. 24:23-25.  He lives in Miami, hundreds of miles away from the trial situs, Jacksonville, in the Middle District of Florida.  Compl. at ¶ 2; 100:17.  He was not admitted to practice in the Middle District of Florida.  17:10-12; 100:17-19.  Finally, as discussed in footnote 7, he barely knew the person he calls "his client."

Furthermore, according to Plaintiff, his 1/3 participation fee was not based upon any agreed split of responsibility or duties; Plaintiff says his participation was that he was essentially to do "[w]hatever Mr. Garland required."  106:1-9; 132:25-133:8; 103:14-20; 105:11-14.  Given these factors, it is hard to conceive how the parties could have contemplated that Mr. Marcus would have actually proportionally participated in 1/3 of the representation of Mr. Jacobson's criminal defense.

[9] Plaintiff's actual "participation" in this case was de minimus.  The activities for which he is claiming he is entitled to 1/3 portion of the fee consisted of sending Mr. Garland a couple newspaper articles, reading local papers, and conversations with Marvin Braun (a co-defendant) and Mr. Braun's attorney, the Honorable Theodore Klein (then in private practice).  142:22-143:5.  He kept no records of the amount of time he spent on these matters, and at his deposition could make no estimate of the time he spent on the matter.  143:13-144:5.



05-21550-CIV-KING/GARBER

at ¶¶ 12-14; Linda Jacobson Affidavit at ¶ 11; Garland affidavit at ¶¶ 8, 9; 134:5-8 (Plaintiff had no understanding whether Mr. Jacobson signed any agreement consenting to a division of fees). Plaintiff admitted he never spoke with Mr. Jacobson about the alleged fee sharing arrangement. 124:12-16.

The alleged oral agreement to split fees Plaintiff is asking this Court to find was made and enforce is a clear violation the Florida rules of ethics.[10] As such, it is void as against public policy and unenforceable.

---

[10] Plaintiff exhibited a lack of basic understanding of the ethical rules on fee division in his deposition. He stated that what he calls a "participation fee" is essentially the same as a referral fee (82:3-12; 82:24-83:3), and his version of the rules seems to be that so long as a lawyer "participates" in any way with the client's case, there is no limitation on the percentage amount of the referral fee.

```
[page 85]
 7        A    My understanding, when I first started
 8   practicing, that it was a third referral fee and that the
 9   Legislature in their intimate wisdom thought they would
10   save the public money by reducing it to 25 percent, and
11   all that meant is that the attorney handling the matter
12   made more, the referring attorney made less. It didn't
13   save the public any money, but that if you are
14   participating I guess in any way, shape or form with the
15   matter, then there is not that limitation.
16        Q    So if you participate, your understanding of the
17   bar's Rule of Professional Conduct is that if you
18   participate in any extent in a case, there's no rule or
19   regulation regarding your share of the fees you've
20   obtained from the client?
21             MS. SCHNEIDER:  Objection to the form.
22        A    Yes.  I think that if you participate in the
23   case you are not merely somebody who has just sailed it
24   over.  In answer to your previous question, then yes, I
25   think you can have a higher percentage than 25 percent.
0086
 1   The 25 percent is when there is no participation
 2   whatsoever, there's no responsibility, there's no input,
 3   there's no back and forth whatsoever.
```

This understanding is apparently consistent with his practice. He says he has never entered into a written agreement with another lawyer regarding sharing a client's fee (128:16-1),


FERRELL

## B. **The Alleged Oral Agreement Is Unenforceable As Against Public Policy.**

A fee agreement that fails to comply with Rule 4-1.5(g)(2) is unenforceable. *Noris v. Silver*, 701 So. 2d 1238, 1241 (Fla. 3d DCA 1997) (stating that a referring attorney could not enforce an oral agreement that does not comply with Rule 4-1.5(g)(2)). The Florida Supreme Court has expressly stated that where the ethical rules require written fee agreements, the rules are necessary for the public interest, and therefore oral agreements that fail to adhere to these requirements are void as against public policy. Such agreements are unenforceable. *Chandris, S.A. v. Yanakakis*, 668 So. 2d 180, 186 (Fla. 1996) ("Thus a contract that fails to adhere to these requirements is against public policy and is not enforceable by a member of the Florida Bar who has violated the rule.").[11]

While *Chandris* dealt with a referral fee in a contingency matter, the Florida Supreme Court has made it clear these considerations apply to all fee contracts required to be in writing. "This

---

although he states that "I in particular have made a nice living from time to time referring people to PI attorneys or criminal attorneys." 73:22-25.

However, Plaintiff's view that by any level of "participation" a fee-sharing agreement can be made as to any percentage of the fee without the client's written consent is simply incorrect. Rule 4-1.5(g)(1) clearly provides that the fee shared must be in proportion to the services provided or rendered, or else the agreement has to be in writing and meet the other requirements of (g)(2). Furthermore, Plaintiff's interpretation of the rule – that any level of "participation" excuses compliance with the restrictions – would simply eviscerate the purpose of the rule, in violation of Rules 1-10.1 and 3-4.3, which require compliance with the spirit and intent of the rules, not simple technical observation.

[11] Some earlier Florida district court decisions had held that a fee sharing arrangement that violated the ethical rule requirements were nonetheless enforceable by the referring attorney as against the other attorney. *See e.g. Kaufman v. Davis & Meadows, P.A.*, 600 So. 2d 1208, 1211 (Fla. 1st DCA 1992). The Florida Supreme Court specifically disapproved of those decisions in *Chandris*: "We do not agree with, and thus expressly disapprove this line of cases to the extent they may be read to hold that a contingent fee contract which does not comply with the Code of Professional Responsibility or the Rules Regulating The Florida Bar is enforceable by an attorney who claims fees based upon a non-complying agreement." 668 So. 2d at 185.



FERRELL

Court expects strict compliance with this rule [Rule 4-1.5(f)(2)] *and similar rules* requiring a client's written consent to an attorney's fee regardless of the circumstances involved. These requirements must be diligently adhered to and enforced in order . . . to preserve public confidence in the legal profession." *Rubin*, 709 So. 2d at 1364 (emphasis added); *cf. State Contr. & Engg Corp. v. Condotte Am., Inc.*, Case No. 97-7014-CV-Dimitrouleas/Torres, 2004 U.S. Dist. LEXIS 28600, *54, *65 (S.D. Fla. 10/24/2004) (noting that any contract in Florida that contravenes an established interest of society can be found to be void as against public policy, and finding fee agreements violating Florida ethical rules are not enforceable unless the violations are merely technical and insignificant).

Our ethical rules require that Plaintiff's alleged oral agreement for a 1/3 referral fee be in a written agreement with the client, Mr. Jacobson. Plaintiff is a member of the Florida Bar and is bound by its rules. Plaintiff's attempt to enforce an unethical referral fee agreement is against the public policy of Florida. The alleged oral agreement Plaintiff seeks to enforce is void and unenforceable.

There being no genuine issue of material fact in dispute about what Plaintiff claims was the oral agreement he made, final summary judgment is appropriate as a matter of law.

## 2. **Plaintiff's Claims Are Barred By the Statute of Frauds.**

Plaintiff's alleged oral agreement in this case is barred by the statute of frauds, because (according to Plaintiff) the intent was that the agreement would last more than one year. Oral agreements not to be performed within one year are barred by the Statute of Frauds.

Section 725.01, Florida Statutes, provides:

No action shall be brought . . . whereby to charge the defendant . . . upon any agreement that is not to be performed within the space of 1 year from the making thereof, . . . unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by



the party to be charged therewith or by some other person by her or him thereunto lawfully authorized.

In the seminal case *Yates v. Ball*, 181 So. 341 (Fla. 1937), the Florida Supreme Court discussed the Statute of Frauds in connection with oral agreements expected to last for more than one year. The Court noted that the Statute of Frauds was designed to intercept the frequency and success of contract actions based on nothing more than "loose verbal statements or mere innuendos." *Id.* at 344. To accomplish this purpose, the statute expressly requires that all actions based on agreements "not to be performed" within one year be based on a written statement or memorandum, signed by the party to be charged. *Id.*

Sometimes oral contracts, such as the agreement Plaintiff alleges in our case, do not identify a specific term of duration. This contingency was addressed in *Yates* as well:

> When no time is agreed on for the complete performance of the contract, if from the object to be accomplished by it and the surrounding circumstances, it clearly appears that the parties intended that it should extend for a longer period than a year, it is within the statute of frauds, though it cannot be said that there is any impossibility preventing its performance within a year.

*Id.* at 344.

Finally, the *Yates* court also considered whether the oral agreement in issue exhibited characteristics of the types of "loose or casual statements" that the rule was designed to limit, or was shown to be bona fide. *Id.* at 345 (noting that "... the very predicate for application of the statute of frauds, a loose or casual statement galvanized with frauds, is absent in this case. All negotiations of both parties to the contract, so far as the record discloses, were open and bona fide with a view of reaching an agreement satisfactory to the parties concerned.").

Thus, following *Yates*, courts have looked to the parties' intent at the time the oral contract was made to determine whether the parties intended the performance to be completed within a year. *All Brand Importers, Inc. v. Tampa Crown Distrib.*, 864 F.2d 748, 750 (11th Cir.



FERRELL

Page 14

1989) ("under Florida law the intent of the parties with regard to the time of *performance* (not the possibility of contingent *termination*) is the key factor in determining whether an oral agreement is enforceable") (emphasis in original); *Flowers v. Finley*, 311 So. 2d 804, 805 (Fla. 3d DCA 1975) (if from the object to be accomplished by the contract and the surrounding circumstances, it clearly appears that the parties intended it should extend for a longer period than a year, it is within the statute of frauds, though it cannot be said that there is any impossibility preventing its performance within a year).

In this case, it is clear that the intent of the alleged oral agreement as defined by Plaintiff was not to be performed within a year, but that the agreement was intended to last more than one year, possibly several years -- as long as Mr. Garland's representation of Mr. Jacobson continued. The agreement alleged by Plaintiff was not simply to be paid for referring the case, but for his ongoing participation in it. As to the alleged agreement, Plaintiff stated:

```
[Page 106]
25      Q     Was your participation supposed to be just for
0107
 1    during the time when Mr. Garland was attempting to be
 2    retained by Mr. Jacobson or was it ongoing?
 3      A     No, ongoing.
 4      Q     And your understanding was that you would make
 5    yourself available for whatever Mr. Garland wanted?
 6      A     Whatever, whenever.
 7      Q     For how long of a period of time?
 8      A     Until the matter was closed, beginning to end.
...

21      Q     Was it your understanding in agreeing to make
22    yourself available that that would include the entire
23    case, including post-trial matters and appeal, and as long
24    as the matter was continuing with Mr. Garland representing
25    Mr. Jacobson?
0108
 1      A     That is correct.
```

The underlying case that Plaintiff alleged to be agreeing to participate in, from beginning to end, was a complicated federal criminal case. The client was informed and understood that



Page 15

this was a significant case, that was expected to last for more than a year, and indeed might take years for the trial, sentencing, and appeal.  Garland affidavit at ¶ 4; Jerome Jacobson affidavit at ¶ 7; Linda Jacobson affidavit at ¶ 9.  The case was a highly publicized, multi-defendant indictment regarding a complex matter, involving a scheme to manipulate the winners of a McDonald's Monopoly game. 64:10-25; see also letter from Ed Garland to Paul Marcus, copy attached to the Complaint (Exhibit 4) (stating that 40 people are expected to be indicted, and that discovery was voluminous, including 130 hours of wiretapped conversations).  The retainer agreement contemplated representation in the criminal case as well as any related forfeiture action.  Garland affidavit at ¶ 8, Exhibit A.  The amount of the fee ($300,000 plus $84,000 for expenses) contemplated a significant effort and defense, consistent with the client's expectations.  Jerome Jacobson affidavit at ¶ 10.  Plaintiff also appreciated that this was a substantial case. 64:10-25; 91:25-92:14.  He understood that Mr. Jacobson was a "major player" in the case. 80:24-85:3.  Given the nature and magnitude of the case, the expectation that it would last for more than a year was not unreasonable.  For that matter, the Court can take judicial notice that it is common knowledge that complex federal criminal cases frequently last longer than a year, particularly when post-trial motions, sentencings, forfeitures, and appeals are considered.

Applying the case law defining the statute of frauds to this case, the alleged oral agreement was an agreement that was intended and expected to last for more than one year. Plaintiff did not condition his role in the agreement to last for only a year.  Mr. Marcus' participation from "beginning to end" admits an oral agreement not intended to be performed within one year.  The fact that the contingency existed that that case could have been concluded within one year does not take this alleged oral agreement outside the statute of frauds when the intent was an agreement to last more than one year.



FERRELL

Page 16

Furthermore, unlike *Yates*, the facts of this case present the exact type of case based on "loose verbal statements or mere innuendos" that the statute of frauds is designed to avoid. There is no evidence of an agreement by Defendants to pay Plaintiff a 1/3 fee, except for Plaintiff's say so. The terms of this agreement was never memorialized in writing (despite several letters sent back and forth) much less a writing signed by the Defendants.[12] Plaintiff did not tell "his client" nor his client's wife about the alleged agreement. 124:12-16; 124:17-21; 102:9-11. All there is to support this alleged oral agreement to pay Plaintiff 1/3 of the fees GSL received for Mr. Garland representing Jerome Jacobson is Plaintiff's claim, based on one phone call with Mr. Garland. 122:21-123:13. This is the kind of unsubstantiated oral agreement that the statute of frauds was enacted to limit.

Therefore, this alleged oral agreement falls within the statute of frauds, and is unenforceable. *Yates*, 181 So. 344 (if parties intended that it should extend for a longer period than a year, it is within the statute of frauds, though it cannot be said that there is any impossibility preventing its performance within a year). There being no material fact in dispute as to Plaintiff's intent about the oral agreement he alleges, final summary judgment is appropriate as a matter of law.

## CONCLUSION

The oral agreement for a percentage division of fees Plaintiff alleges was made, accepting Plaintiff's contention as true for purposes of this Motion, is a complete violation of the Florida

---

[12] There was correspondence exchanged between Plaintiff and Mr. Garland, after Plaintiff asserted he referred his client, and Mr. Garland sent Plaintiff $5000 out of his firm's general operating account as an appreciation. However, there is no documentation, including letters written by Plaintiff, that memorializes his claim that a 1/3 fee for referring the matter was agreed to.



FERRELL

Rules of Professional Conduct. The supposed agreement as defined by Plaintiff provides for a percentage division of a client's fee between two different law firms not based upon services performed, and therefore was required by the Rules of Professional Conduct to be a written agreement with the client, disclosing the division of fees and the reasons for it, with both lawyers taking responsibility for the case. The alleged oral agreement wholly fails to meet the requirements of the Rules, and is therefore void against public policy and unenforceable.

Plaintiff also alleges that the oral agreement he made with Mr. Garland required his "participation" for as long as the case lasted, including post-trial and appeal. It was understood this was a significant case that was expected to take more than a year and that might last several years. Thus, the oral agreement alleged by Plaintiff was an agreement intended to last for more than a year, was not to be performed within one year, and is therefore barred by the statute of frauds.

There being no genuine issue of material fact as to either issue, and judgment as a matter of law being appropriate for both, final summary judgment should be entered for Defendants.



Respectfully submitted,

FERRELL LAW, P.A.

By: _____
      Bryan R. Cleveland
      Florida Bar No. 0801984
      brc@ferrellworldwide.com
      Joseph Beeler
      Florida Bar No. 0130990
      jb@ferrellworldwide.com
      201 South Biscayne Boulevard
      34th Floor, Miami Center
      Miami, Florida 33131
      Phone: (305) 371-8585;
      Fax: (305) 371-5732

      Attorneys for Defendants Garland, Samuel
      & Loeb P.C. and Edward T.M. Garland

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by mail

this 9th day of May, 2006 upon:

      Mary Margaret Schneider
      Levey, Airan, Shevin, Roen, Kelso, Corona & Herrera LLP
      Gables One Tower, Penthouse
      1320 South Dixie Highway
      Coral Gables, FL 33146
      Telephone No. (305) 661-6664
      Facsimile No. (305) 661-6477
      Attorneys for Plaintiff



Page 19

EXHIBIT 1

STATE OF GEORGIA
COUNTY OF GWINNETT

## AFFIDAVIT OF JEROME JACOBSON

JEROME JACOBSON being first duly sworn, states as follows:

1. I am a resident of Lawrenceville, Georgia.

2. I have personal knowledge of the facts stated herein.

3. I was a defendant in the lawsuit styled USA v. Jacobson, et al., Case number 3:01-cr-00251-HLA-MCR-1.

4. I was arrested in this case on August 21, 2001, and released on bond the following day.

5. I learned about Mr. Garland through several sources. I had been a police officer in Atlanta, and through my position became generally familiar with the reputation of the better known criminal defense attorneys in town. Mr. Garland was, and is, a well known defense attorney in Atlanta, and he and his firm have an excellent reputation for quality and integrity. I was also told about him by a cellmate in the Fulton County jail were I was incarcerated for a night before I was released on bond. My wife, Linda Jacobson, also had his name on a list of potential attorneys she had independently developed, and we discussed contacting Mr. Garland when my wife picked me up at the jail.

6. Later that same day, I met with my step-brother, Marvin Braun, who lives in Miami and had flown up to Atlanta to meet us. Marvin said he had gotten the name of a highly recommended lawyer, and named Ed Garland. I told him I had heard about him. Marvin arranged for us to meet Mr. Garland the next day. Marvin did not mention Paul Marcus, and I thought Marvin had gotten Mr. Garland's name from Marvin's attorney, Ted Klein.

7. I met with Mr. Garland for several hours the following day, August 23. I retained him to represent me that day. I understood from Mr. Garland that my case was significant, and that it might take years for the trial and sentencing and any appeal.

8. I was sentenced in the above case on January of 2003.

9. We arranged to pay an initial retainer that first day we met with Mr. Garland. We also discussed the matter of a fee. We had initially considered a fee of $150,000.00, but because of collateral matters and the fact that my wife needed representation also, the fee was changed to $300,000 to include her representation as well.

10. Part of the reason I retained Mr. Garland and agreed to these fees is because I understood Mr. Garland's reputation as a lawyer who fought for his client and I expected him to vigorously represent me and that it would involve a significant effort.

11. I was never Paul Marcus' client. I hardly know him, and I can recall meeting him only once at my step-brother Marvin's house. I didn't know he was an attorney.

12. I never spoke to Paul Marcus about Mr. Garland, or any matter pertaining to my case.

13. I was never informed or aware that Paul Marcus was to play any role in our representation; or that he did in fact play any role in my representation. I have not seen him or spoken to him since I was arrested. He never attempted to contact me.

14. I was never informed there was any agreement to share in any way with Paul Marcus the fee we paid to Mr. Garland's firm. I never saw or signed any written agreement regarding such a fee sharing arrangement. Nobody, including Marvin, ever told me about any agreement between Mr. Garland and Mr. Marcus to share in any way the fees we paid Mr. Garland's firm.

15. I do not recall Mr. Marcus' name ever being mentioned during the time I was obtaining an attorney. The first I learned that Mr. Marcus was claiming there was an agreement to share the fee I paid to Mr. Garland's firm was after my criminal case had concluded.

Page 2

16. Mr. Garland and his firm represented me not only in the criminal case but on several

collateral matters, continuing to this day.

JEROME JACOBSON

The foregoing instrument was [sworn to and subscribed] [acknowledged before me] this ___8th___ day of May, 2006 by Jerome Jacobson, who is personally known to me or who has produced _Driver's License_ as identification.

Signature of Notary

Print Name: _Laura Klemenc_
NOTARY PUBLIC, STATE OF GEORGIA

Commission No. _03-NT-0285_
My Commission Expires: _8/25/07_

La  a L Klemenc
561 Sletten Drive
Lawrenceville, GA 30045

Page 3

EXHIBIT 2

STATE OF GEORGIA

COUNTY OF FULTON

## AFFIDAVIT OF EDWARD T. M. GARLAND

EDWARD T. M. GARLAND being first duly sworn, states:

1. I am a resident of Atlanta, Georgia

2. I have personal knowledge of the facts stated herein.

3. I was retained by Jerome Jacobson to represent him in the lawsuit styled USA v. Jacobson, et al., Case Number 3:01-CR-00251-HLA-MCR-1 (hereinafter "the Jacobson case").

4. I considered the Jacobson case to be a major case with complex facts and multiple defendants. I expected it to take over a year, and considerably longer if any appeals were filed. I shared my opinions on this with Mr. Jacobson when I first met with him.

5. I never made any agreement to share the attorney's fees paid to my firm in this case with any lawyer.

6. Specifically, I did not make any agreement to share the attorney's fees paid to my firm in the Jacobson case with Paul Marcus.

7. I never discussed any arrangement to share attorneys' fees with Mr. Marcus with Jerry Jacobson or Linda Jacobson.

8. The retainer agreement signed by the Jacobsons and my firm contains no reference to sharing fees with another lawyer. A true and correct copy of the retainer agreement is attached as **Exhibit A**.

{00202635.DOC;1}

9.  Neither Jerry Jacobson nor Linda Jacobson ever indicated to me that they were aware of any arrangement whereby I would be sharing the attorney's fees paid to my firm in the case with any lawyer and, accordingly, they certainly did not consent to such an arrangement.

Having thus sworn, Affiant sayeth no more.

EDWARD T. M. GARLAND

The foregoing instrument was [sworn to and subscribed] [acknowledged before me] this 8th date of May, 2006 by Edward T. M. Garland, who is personally known to me or who has produced _drivers license_ as identification.

Signature of Notary

Print Name: _P. A. HENRITZE_
NOTARY PUBLIC, STATE OF GEORGIA

Commission No. _____
My Commission Expires:

P. A. Henritze
Notary Public, Gwinnett County, GA
My Commission Expires December 20th, 2007

{00202635.DOC;1}

# EXHIBIT 2- A

## CONTRACT OF EMPLOYMENT
(Flat Fee plus Costs)

I, the undersigned client, hereby employ Garland, Samuel & Loeb, P.C., (the "Firm") 3151 Maple Drive, Atlanta, Georgia 30305, to act on my behalf pursuant to the terms of this contract which sets forth our entire agreement.

## SCOPE OF REPRESENTATION

I agree that you will be representing me in the following matter: United States of America v. Jerome Jacobson, Et Al., Criminal Indictment No. 3:01-CR-251-J-25-TEM, now pending in the United States District Court for the Middle District of Florida as well as any forfeiture action related thereto. The services you are to perform will include all those actions which, in your judgment, are necessary to represent me adequately.

## LEGAL FEES AND COSTS

I agree to pay to the Firm a total non-refundable legal fee of $300,000.00 (the "Legal Fee") for the services to be rendered pursuant to this agreement. It is understood that the Legal Fee has already been paid.

I understand that Garland, Samuel & Loeb, P.C. will incur certain expenses including, for example, long distance telephone charges, photocopying, expert fees, travel expenses and litigation-related expenses. I agree to pay such expenses in addition to the Legal fee. In this regard, $84,000 has already been posted with the Firm to cover anticipated expenses.

## NO GUARANTEED RESULTS

I acknowledge that Garland, Samuel & Loeb, P.C. has made no guarantee of the outcome of any phase of the matter for which it has been retained.

## WITHDRAWAL OF ATTORNEY
## AND TERMINATION OF AGREEMENT

I understand that Garland, Samuel & Loeb, P.C. may withdraw from its representation of me and terminate this agreement at any time if I:

(a) insist upon presenting a claim or defense which is not warranted under existing law and cannot be supported by a good faith argument for modification or reversal of existing law;

(b) personally seek to pursue an illegal course of conduct;

(c) insist that my attorney pursue an illegal or unethical course of conduct;

(d) fail to cooperate with my attorney on any matter when requested by my attorney to do so.

I understand that I may discharge Garland, Samuel & Loeb, P.C. and terminate this contract at any time.

In the event of the withdrawal or discharge of Garland, Samuel & Loeb, P.C., I expressly agree that Garland, Samuel & Loeb, P.C. shall be entitled to the entire Legal Fee and expenses incurred in representing me, all of which shall be due and payable at the time of such termination, unless we agree otherwise.

I have read and understood this entire agreement prior to signing, and I understand that this document will serve as full authorization to Garland, Samuel & Loeb, P.C. to act on my behalf.

Agreed to this ___3rd___ day of ___October___, 2001.

_____
JEROME JACOBSON

READ, ACKNOWLEDGED AND APPROVED BY:

_____
LINDA JACOBSON

ACKNOWLEDGED AND ACCEPTED BY:

GARLAND, SAMUEL, & LOEB, P.C.

_____
By: EDWARD T.M. GARLAND, ESQUIRE
3151 MAPLE DRIVE
ATLANTA, GEORGIA 30305
(404) 262-2225

2

EXHIBIT 3

1

1     UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF FLORIDA

2

   CASE NO. 05-21550-CIV-KING/GARBER

3

4 PAUL R. MARCUS,

5      Plaintiff,     **COPY**

6 vs.

7 GARLAND, SAMUEL & LOEB, P.C. and

 EDWARD T.M. GARLAND,

8

      Defendants.

9 _____/

10

11         Suite 3400

          201 S. Biscayne Blvd.

          Miami, Florida

12         Friday, 9:50 a.m.

          February 3, 2006

13

14

15

16

17    DEPOSITION OF PAUL R. MARCUS

18

19

20

21   Taken before Jennifer D. Belz, CM, Shorthand

22 Reporter and Notary Public for the State of Florida,

23 pursuant to Notice of Taking Deposition filed in the

24 above cause.

25

1     A    The Southern District of Florida, the Circuit

2  Court in Atlanta, and I have tried cases in the Supreme

3  Court of the United States where I have also had cases.

4     Q    Other than the Southern District of Florida, are

5  you admitted to practice in any other district?

6     A    No, sir.

7     Q    Have you ever been admitted to practice in any

8  other districts?

9     A    No, sir.

10    Q    Have you ever been admitted to practice in the

11  Middle District of Florida?

12    A    No, sir.

13       (Interruption.)

14  BY MR. CLEVELAND:

15    Q    Has your license to practice law ever been

16  suspended or revoked?

17    A    No, sir.

18    Q    Have you ever been subject to bar disciplinary

19  proceedings?

20    A    Yes, sir.

21    Q    How many times?

22    A    Once.

23    Q    Tell me about that.

24       MS. SCHNEIDER:  I'm going to object to that

25    because I believe it's privileged unless it has been

22

1  problems that you discussed early this morning regarding

2  radiation, medications, chemotherapy, things like that?

3       A    When was I first diagnosed or when did I

4  first -- maybe a year-and-a-half ago I had pain in my arm,

5  September-ish of '04.  To give you just briefly, my mother

6  passed away the 26th of July of '05 and shortly thereafter

7  I was, sometime August, September, diagnosed with cancer.

8       Q    This is August, September of '04?

9       A    '05, sir.  The death was also '05.  First it was

10 Hurricane Katrina.  When was Hurricane Katrina?

11            MS. SCHNEIDER:  Just listen to the question.  I

12       think you've answered the question.

13       Q    Prior to August or September of '05 were you

14 practicing full-time as an attorney?

15       A    Yes.

16       Q    And what is the nature of your practice

17 currently?

18       A    My practice is a divorce practice, family law

19 practice.

20       Q    And how long have you been practicing divorce,

21 family law?

22       A    Well, I've done some since the inception of my

23 practice, but how long -- it has been a predominant part

24 the last 20 years, so.

25       Q    Do you currently have any kind of a criminal

23

1    defense practice?  In other words, do you take criminal

2    defense cases?

3              (Thereupon, Mr. Beeler exited the deposition

4    room.)

5        A    No.

6        Q    Have you ever had any criminal defense practice

7    or regularly taken criminal defense cases?

8        A    Yes.

9        Q    When did you used to practice criminal defense

10   type of law?

11       A    Well, I worked in the U.S. Attorney's office in

12   1967, I worked for George Nicholas in 1968, and in private

13   practice I took criminal cases until sometime in the '80s.

14       Q    Did you take felony cases?

15       A    Yes, sir.

16       Q    And the last criminal defense case you

17   represented an accused person was in the mid 1980s; is

18   that fair to say?

19       A    I can't give you any specific time.  It may be

20   in the early '80s.

21       Q    Have you kept up with the practice of criminal

22   law at all in terms of cases and statutes, rules, changes

23   in that since the early 1980s?

24       A    I read Florida Law Weekly.  Every change --

25       Q    When you read the Florida Law Weekly do you read

24

1    the sections on criminal law as well?

2         A    Yes, sir.

3         Q    Do you feel like you're pretty familiar with

4    current criminal law and procedure?

5         A    I don't know.

6         Q    You don't know if you're familiar or not?

7         A    I don't practice criminal law at this time.

8    It's generally my practice, when I read something I read

9    it cover to cover.

10        Q    Do you know what Jenks material is?

11        A    No.

12        Q    Do you know what Rule 6(e) of the Criminal

13   Federal Rules of Criminal Procedure is?

14        A    No.

15        Q    Do you know what Rule 29 is in the Criminal

16   Rules of Criminal Procedure?

17        A    No, sir, I do not know the criminal law by

18   rules.

19        Q    When you did some criminal defense work prior to

20   the early '80s did you practice in Federal Court as well

21   as State Court, or either, or which?

22        A    I did, I appeared in both Federal and in State.

23        Q    Have you ever represented a criminal defendant

24   in a Federal Court trial?

25        A    No.

36

```
 1        A    I did.  Is that what you meant it to mean, sir?

 2        Q    I --

 3        A    It's your document.

 4        Q    I presumed who it was.  We will talk about that

 5   in a second.  Your complaint simply refers to a client and

 6   not a particular person, so I wasn't exactly sure who you

 7   meant.

 8             I'm going to show you what I've marked as

 9   Exhibit Number 3.  Do you recognize that?

10        A    Yes, sir.

11        Q    That's the complaint you filed against a

12   Mr. Garland and Garland, Samuel & Loeb in this case,

13   correct?

14        A    Yes, sir.

15        Q    Did you review the allegations of this complaint

16   at the time it was filed?

17        A    Yes, sir.

18        Q    And were the allegations accurate?

19        A    I believe so.

20        Q    Do you have any reason to believe today that

21   they are not accurate?

22        A    No.

23        Q    Let me refer you to Exhibit Number 3, Paragraph

24   5.  It states --

25        A    Just a moment.  One handed it takes me -- oh,
```

1    Paragraph 5.  I was looking -- I'm sorry.

2        Q    It states, "On or about September 15, 2001,

3    Plaintiff referred a client facing prosecution in the

4    United States District Court in and for the Middle

5    District of Florida."  Is the client referred to in that

6    paragraph Mr. Jacobson?

7        A    Yes.

8        Q    Is there any other client that is referred to by

9    the word client in the complaint which is marked as

10   Exhibit 3?

11       A    No.

12       Q    Do you keep any kind of a log of your phone

13   calls?

14       A    No.

15       Q    Let me talk to you about the defendant, Edward

16   Garland, in this case.  When did you first meet him?

17       A    1981.

18       Q    How did you meet him in 1981?

19       A    I was referred to Mr. Garland by Neal Sonnet and

20   retained Mr. Garland as counsel.

21       Q    You personally retained him to represent you?

22       A    Yes, sir.

23       Q    Was this in conjunction with the charge that

24   we've discussed earlier?

25       A    Yes, sir.

1    Q    But it was several years before 2001; is that

2  correct?

3    A    Yes.

4    Q    How many times have you met Mr. Jerome Jacobson

5  face to face?

6    A    At various functions such as bar mitzvahs, bat

7  mitzvahs -- no, weddings, funerals, shivahs that involve

8  Mr. Braun in which Mr. Jacobson attended and I attended.

9    Q    And who is Mr. Braun?

10    A    He refers to him as his brother.  I think it's

11  his step-brother or half-brother.

12    Q    What is Mr. Braun's full name?

13    A    Marvin Braun.

14    Q    Have you ever been retained by Jerome Jacobson

15  to represent you in a legal matter?

16    A    The only matter in which I have been involved

17  with with Mr. Jacobson is the matter, underlying matters

18  in this case.

19    Q    Other than that, he's never retained you to --

20    A    That is correct.

21    Q    Did he retain you to represent him in the matter

22  referenced in the complaint?

23    A    I believe that I was retained to assist him in

24  getting counsel in Georgia or for the Middle District of

25  Florida and to assist and take responsibility and assist

1    with regard to that matter.

2         Q    Retained by Mr. Jerome Jacobson?

3         A    By Mr. Braun for Mr. Jacobson.

4         Q    Did you enter into any kind of fee agreement

5    with Mr. Braun regarding this task of obtaining counsel

6    for Jerome Jacobson?

7         A    No.  I believe it was understood that I would be

8    participating in the fee that would be paid to

9    Mr. Garland, or his firm, there would be no separate

10   billing.

11        Q    So when you were retained by Mr. Brom --

12        A    Braun.

13        Q    B-R-A-U-N?

14        A    That is correct.

15        Q    -- Mr. Garland was already representing

16   Mr. Jacobson?

17        A    No.

18        Q    So how was there an understanding that you would

19   be paid a fee from Mr. Garland at the time you were

20   retained by Mr. Braun?

21        A    Mr. Braun and Jacobson were in an attorney's

22   office in Atlanta.  It was a weekday, it was my guess

23   6:30, 7 o'clock at night.  They were about to retain an

24   attorney for Mr. Jacobson.  I contacted Marvin, talked to

25   him about the matter at hand, discussed certain things

1  about it, his involvement, Jacobson's involvement, and

2  suggested that I contact Mr. Garland and see if

3  Mr. Garland would agree to the representation of

4  Mr. Jacobson and that I would assist him locally, locally

5  meaning Miami, with whatever I could.  And then I

6  contacted Mr. Garland -- you want me to go further with

7  that, sir, or not?

8       Q     No, let's not, because we're going to have to go

9  over it again.  I want to go into more detail.  We'll go

10  back to the question about the understanding of your fee

11  and your retention by Mr. Braun later.

12            Did you ever have an understanding with

13  Mr. Jacobson that Mr. Jacobson was retaining you for legal

14  services in any way as opposed to Mr. Braun?

15       A     My discussion was with Marvin.

16       Q     You had no discussion with Mr. Jacobson about --

17       A     No, no.

18       Q     I have to finish the question.

19       A     Sure.

20       Q     You had no discussion with Mr. Jacobson to the

21  effect that Mr. Jacobson, himself, was retaining you

22  regarding the matter raised in the complaint?

23       A     I had no individual discussion with

24  Mr. Jacobson.

25       Q     Okay.  Do you know what business Mr. Jacobson

48

```
 1   was in before his legal problems discussed in the
 2   complaint?
 3        A    You know, I did, and I can't recall at this
 4   time.
 5        Q    Do you know what he looks like?
 6        A    Yes.
 7        Q    How would you describe him?
 8        A    He's a little overweight, receding hair, very
 9   jovial guy.
10        Q    What color hair does he have?
11        A    Brownish.  I don't get a vivid picture of him at
12   this time.
13        Q    Do you know how tall he is roughly?
14        A    I'd say he's taller than I am.
15        Q    And how tall are you?
16        A    Five-ten.
17        Q    Other than being taller than five-ten, how much
18   taller than you is he?
19        A    He's not a basketball star.  I don't know,
20   because it never really concerned me, sir.
21        Q    When you talked to him and met face to face and
22   you stood with him did you look up to him a few inches?
23        A    I don't remember.
24        Q    Or basically in the eyes?
25             MS. SCHNEIDER:  You've answered the question.
```

64

1  Q  Had he been arraigned or involved in any

2  proceedings at that time?

3  A  I don't know.  Don't recall, I should say.

4  Q  You don't recall what the status of the criminal

5  proceeding was at that time?

6  A  No, sir, I do not.

7  Q  Do you know if he had been indicted or a formal

8  information had been filed, or anything of that nature?

9  A  I do not know -- I do not recall, excuse me.

10  Q  Other than the fact that he was in some sort of

11  trouble, you didn't have any understanding of what the

12  situation was?

13  MS. SCHNEIDER:  Objection to the form.

14  A  My understanding was that there was going to be,

15  charges in this McDonalds Monopoly matter, a federal

16  matter, they would be Jacksonville and they would be

17  substantial.  I mean you're talking about McDonalds.

18  They're not going to sit back and let nothing happen.

19  They've got to make, you know, major waves, and it's

20  different when you have that versus say Smith Seamstress.

21  So this was going to be a major situation.  It was already

22  publicized that there was a real problem.

23  Q  How did you know it was already publicized?

24  A  I had heard of it, that there was an alleged

25  scam with regard to the game.

```
 1       Q    Okay.  Did Mr. Braun indicate to you that he had
 2  tried to contact Mr. Garland?
 3       A    No.  He had not tried to contact Mr. Garland.
 4       Q    Did you suggest to him, Why don't you give
 5  Mr. Garland a call?
 6       A    No.  I suggested -- I told him I would talk, try
 7  to reach Ed and that I would get back to him ASAP.
 8       Q    Why didn't you tell him just to call Ed
 9  directly, Mr. Garland?
10       A    Business.
11       Q    What do you mean business?
12       A    I wanted to contact Mr. Garland and I wanted to
13  make arrangements for him to represent Mr. Jacobson and I
14  wanted to make arrangements with regard to my
15  participation and what I would receive.  I have referred
16  people to PI, criminal lawyers throughout my career.
17       Q    So you had a financial interest in you
18  contacting Mr. Garland?
19       A    Absolutely.
20       Q    Did you tell Mr. Braun about your financial
21  interest in this regard?
22       A    I've talked with Marvin many times about how
23  lawyers and how I in particular have made a nice living
24  from time to time referring people to PI attorneys or to
25  criminal attorneys.  He is certainly aware of that and he
```

80

1      Q      When you mentioned Mr. Jacobson's name did

2  Mr. Garland express any familiarity with the name?

3      A      No.  He had no clients involved in the matter.

4  There was no conflict of interest.  You know, his firm is

5  not, you know, a Walton Lantaff or a Greenberg Traurig

6  where they have to go through a conflict thing because

7  there's so many attorneys.  He would have known if there

8  was any involvement with the firm, if there was a

9  conflict.

10          MR. CLEVELAND:  I need another pen.

11          (Discussion off the record.)

12          (Brief recess held.)

13  BY MR. CLEVELAND:

14      Q      Okay.  Mr. Marcus, I want to go through this

15  conversation you said you had with Mr. Garland.  Now, when

16  you first talked to him you told him you had a client that

17  needed representation, right?

18      A      Yes.

19      Q      And you informed him in some way it involved a

20  criminal matter?

21      A      Yes.

22      Q      And what else did you tell him when you first

23  talked about the case?

24      A      That I had somebody that needed legal

25  representation with regard to the McDonalds Monopoly game

82

1    in the matter, my participation fee, and that I expected

2    to receive one-third of the total fees when received.

3         Q    What's the difference between a participation

4    fee and a referral fee?

5         A    In many jurisdictions there may be no

6    difference.

7         Q    What's your understanding of the difference?

8         A    In this situation I don't think it made it,

9    initially made a difference.  I expected remuneration if

10   it was a referral where there was no participation.  I was

11   ready, willing and able to participate with whatever he

12   wanted or the client wanted.

13        He made it very crystal clear, he said, You will

14   participate, you will let me know what's going on in

15   Florida, you will send me articles, what's in the paper,

16   you will have discussion with Braun, you will let me know

17   what's happening from that end, you will make yourself

18   available, you know, I can call you in the evening, you

19   know, I can call you on your cell phone, you will make

20   yourself available and you will participate to whatever

21   need I have, even, you know, coming up if he requested it,

22   and I certainly had no problem with that and agreed to do

23   so.

24        Q    So it's your understanding that a referral fee

25   is a fee paid when you refer a client, but you do not

83

1   participate in the case, and a participation fee is where

2   you refer a client, but you do participate in the case?

3        A    I don't know if there is a specific difference.

4        Q    In your mind is the term referral fee and

5   participation fee synonymous?

6        A    I've never really separated it before, sir, but

7   I said that I would participate, he asked that I

8   participate and I said I would do that which he requested,

9   add then the percentage, it was on a percentage basis.

10       Q    As you sit here today is there any difference in

11  your mind between the terms participation fee and referral

12  fee?

13       A    I guess if it's strictly a referral, then you

14  have no contact whatsoever.

15       Q    In other words, with a referral fee situation

16  you just get a fee for referring the case, but you don't

17  participate in the case; is that fair to say your

18  understanding is?

19       A    You would have no contact.

20       Q    When you say no contact, you mean --

21       A    Well, if I "referred" a Workman's Compensation

22  case to somebody and never spoke to the attorney, never

23  wrote to the attorney, never talked to the attorney, never

24  had anything, and at the end of the matter there was a

25  check that was coming back to me, I would participate in

1   Q     What's your understanding of the rule?

2         MS. SCHNEIDER:  The rule about what?  There are

3   rules about different kinds of contracts, different

4   kinds of fees.

5   Q     You can answer the question, if you understand.

6         MS. SCHNEIDER:  Objection to the form.

7   A     My understanding, when I first started

8   practicing, that it was a third referral fee and that the

9   Legislature in their intimate wisdom thought they would

10  save the public money by reducing it to 25 percent, and

11  all that meant is that the attorney handling the matter

12  made more, the referring attorney made less.  It didn't

13  save the public any money, but that if you are

14  participating I guess in any way, shape or form with the

15  matter, then there is not that limitation.

16  Q     So if you participate, your understanding of the

17  bar's Rule of Professional Conduct is that if you

18  participate in any extent in a case, there's no rule or

19  regulation regarding your share of the fees you've

20  obtained from the client?

21        MS. SCHNEIDER:  Objection to the form.

22  A     Yes.  I think that if you participate in the

23  case you are not merely somebody who has just sailed it

24  over.  In answer to your previous question, then yes, I

25  think you can have a higher percentage than 25 percent.

1   The 25 percent is when there is no participation

2   whatsoever, there's no responsibility, there's no input,

3   there's no back and forth whatsoever.

4        Q    Does the degree of participation make any

5   difference to your understanding of the Florida Bar Rules

6   of Professional Conduct?

7             MS. SCHNEIDER:  Objection to the form.

8        A    I don't think that there's anything specific as

9   to that that I recall.  I know attorneys that -- I don't

10   recall, sir.  If you'd like to show it to me, I'd be happy

11   to read it.

12       Q    We may do that a little later.  I'm just trying

13   to get what your understanding is.  Have you reviewed the

14   rule in preparation for your deposition?

15       A    No, sir.

16       Q    In your conversation with Mr. Garland, your

17   initial conversation with Mr. Garland regarding

18   Mr. Jacobson, if I understood your testimony you told him

19   that you expected either a referral fee or a participation

20   fee, correct?

21       A    Excuse me?  Yes, that there would be a third

22   participation fee.

23       Q    Did you say just a participation fee or was it a

24   referral fee or a participation fee?

25       A    Do I recall the exact word I used, sir?  No, I

1          (Thereupon, the question referred to was read by

2   the reporter as above recorded.)

3       A    It's not a question.

4       Q    Okay.  Well, instead of that's what I was

5   asking, that's what I am asking.

6              MS. SCHNEIDER:  No.  Ask a question.

7       A    Would you like to state it --

8       Q    All right.  Let me state it again just so we

9   have a clear record.  Was there any discussion with

10  Mr. Garland in this initial conversation you had with him

11  regarding Mr. Jacobson about where your one-third

12  remuneration would come from, either Mr. Garland or

13  Mr. Jacobson or somebody else?

14             MS. SCHNEIDER:  Objection, asked and answered.

15      A    Yes.

16      Q    And what were those conversations?

17      A    That Mr. Garland would pay, cut me a check, I

18  didn't use the word, one-third of the fees.

19      Q    Now, you made this agreement you're claiming you

20  made with Mr. Garland before Mr. Garland spoke to

21  Mr. Jacobson; is that correct?

22      A    That is correct.

23      Q    Did Mr. Garland know whether he was going to be

24  able to represent Mr. Jacobson at that time?

25      A    Mr. Garland expressed an interest as previously

 1    answered in representing the person that I alluded to.  He

 2    had no, he had no conflict of interest.  He wasn't

 3    representing anybody else in this matter.  And since it

 4    was a major player and he knew the essence of the matter,

 5    I think he realized that there would be substantial fees

 6    involved.

 7        Q    Why would he realize that?

 8        A    If you have a client who stole this can of soda

 9    from the 7/Eleven, one would assume an attorney would know

10    that the fees aren't substantial.  If you go into Southern

11    Spirits and you empty their warehouse, one would assume

12    that the fees would be larger.  Come on now.

13        Q    There's a substantial case there?

14        A    Yes.

15        Q    Did you have a discussion with Mr. Garland about

16    whether Mr. Jacobson had any assets or ability to pay

17    fees?

18        A    Yes.

19        Q    Oh, you had, you had the conversation about that

20    when?

21        A    In this conversation.

22        Q    What did you tell him?

23        A    I told him that the client with family had the

24    ability to retain him and certainly Ed would have known I

25    wouldn't have, I wouldn't have called Ed if we're talking

1   wanted a participation fee?

2       A    That I will participate in this case with a

3   one-third remuneration, and he said, Fine, you will

4   participate and you will make yourself available, et

5   cetera, et cetera, et cetera.  We'll do that again for the

6   tenth or twelfth time.

7       Q    No, you keep saying that when you're not

8   responding to other questions, so you keep saying it again

9   and again and I'm trying to direct my questions, if I'm

10  doing it inartfully I'm sorry, but I'm trying to direct my

11  questions to other matters so you don't have to keep

12  adding that.  We haven't talked about that yet and we

13  will.

14           You weren't practicing criminal defense law at

15  that time, correct?

16      A    That is correct.

17      Q    And the case was being conducted up in the

18  Middle District of Florida, correct?

19      A    That is correct.

20      Q    You weren't admitted to practice in the Middle

21  District of Florida, correct?

22      A    That is correct.  Not a problem, but it's

23  correct.

24      Q    Did Mr. Garland explain to you why he wanted

25  your participation in the case or why he thought it was

1      A      I don't recall.

2      Q      Did you talk to him about your relationship with

3  Mr. Jacobson?  Did you talk to Mr. Garland about your

4  relationship with Mr. Jacobson?

5      A      Without identifying the parties by name, I

6  identified the parties as to my relationship with them.

7      Q      And what did you tell Mr. Garland about your

8  relationship with Mr. Jacobson?

9      A      That he was the half-brother or step-brother of

10  Mr. Braun, who I've been associated with on many levels

11  for a very, very, very long period of time.

12      Q      Did Mr. Garland ask you if you had had any

13  conversations with Mr. Jacobson?

14      A      No.

15      Q      Did he ask you any questions about your

16  relationship with Mr. Jacobson?

17      A      No.

18      Q      Did he ask you about your relationship with

19  Mr. Braun?

20      A      I -- no, because I told him.

21      Q      Did Mr. Garland ask you any questions about

22  Mr. Braun's authority to retain an attorney for

23  Mr. Jacobson or anything of that nature?

24      A      I don't recall.

25      Q      Now I'm going to ask you specifically a question

1   about it.  I know you've talked about it several times,

2   but Mr. Garland discussed with you what he wanted your

3   participation to be in the case; is that correct?

4        A    Yes.

5        Q    And what did he tell you he wanted your

6   participation to be?

7        A    Sir, I have answered that repeatedly and please

8   ask me a fresh question.

9        Q    I don't think I ever specifically asked you

10  about that.  I know you've testified about it, but I want

11  to make a list.  So please tell me what you recall sitting

12  here now that he told you your participation would be.

13            MS. SCHNEIDER:  One last time.

14       A    That you will participate; that you will discuss

15  with, you know, whatever is happening with Mr. Braun; you

16  will let me know what is happening; you will tell me

17  what's in the local papers; you will forward me what you

18  find; you will make yourself available for discussion; you

19  will discuss with Mr. Braun, you will relate the

20  discussions to me; you will be available, you know, night

21  and day; you will come up if I, meaning Garland, deem it

22  necessary; that I would make myself available; that I

23  would take that responsibility.

24       Q    Did Mr. Garland indicate to you what he expected

25  you to discuss with Mr. Braun?

1    correct?

2         A    Wanted to know what was happening in Miami.

3         Q    Did he indicate to you why it was important to

4    know what was happening in Miami if the case was pending

5    in the Middle District of Florida?

6         A    Just asked me if I would let him know.

7         Q    Does the Middle District of Florida encompass

8    Miami, to your knowledge?

9         A    No, it does not, sir, and no, I didn't ask him

10   why.

11        Q    Did Mr. Garland indicate to you he expected you

12   to participate in trial preparation in any way?

13        A    I would make myself available for whatever he

14   wanted.

15        Q    Did Mr. Garland indicate to you he expected you

16   to participate in trial preparation in any way?

17        A    I've asked and answered it.

18        Q    Is the answer yes or no?

19        A    The answer is that I said --

20             THE WITNESS:  Would you read back my answer,

21        please?

22        Q    You said you would make yourself available in

23   any way?

24        A    Any way he wanted.

25        Q    I'm not asking you whether he asked you that.

1    I'm asking you specifically if he talked to you about

2    participating in the trial preparation?

3        A    There was no discussion as to that, sir.

4        Q    Did he discuss with you participation in any

5    pretrial motions or anything like that?

6        A    There was no discussion as to specifics, sir.

7        Q    Just generally that you would make yourself

8    available?

9        A    For whatever he wanted.

10       Q    And he didn't discuss what that might be in any

11   way?

12            MS. SCHNEIDER:  Other than what he's already

13       told you?

14       A    Did I not make myself clear?  Any part of my

15   language you don't understand, sir?

16       Q    I'm trying to find out if other than you just

17   saying you would make yourself available --

18       A    That's it.

19       Q    -- if there was any discussion about what that

20   might entail?

21       A    That's it.

22       Q    There was no discussion about what making

23   yourself available might entail?

24       A    That's true.

25       Q    Was your participation supposed to be just for

107

1    during the time when Mr. Garland was attempting to be

2    retained by Mr. Jacobson or was it ongoing?

3         A    No, ongoing.

4         Q    And your understanding was that you would make

5    yourself available for whatever Mr. Garland wanted?

6         A    Whatever, whenever.

7         Q    For how long of a period of time?

8         A    Until the matter was closed, beginning to end.

9         Q    Did he tell you he expected you to make yourself

10   available for whatever he wanted during an appeal, for

11   example?

12        A    There was no discussion as to an appeal, for

13   example.

14        Q    How about matters pertaining to post-trial

15   issues, any discussion about that?

16        A    I think it's been asked and answered, sir.

17        Q    Well, if you'd just answer the question again,

18   we can move on.  Was there any discussion with Mr. Garland

19   about anything regarding post-trial matters?

20        A    No.

21        Q    Was it your understanding in agreeing to make

22   yourself available that that would include the entire

23   case, including post-trial matters and appeal, and as long

24   as the matter was continuing with Mr. Garland representing

25   Mr. Jacobson?

```
 1     A    That is correct.  If I --

 2     Q    Did Mr. Garland have any conversations with you

 3 about how long he thought the case might take?

 4     A    No.

 5     Q    I'm talking about this initial conversation

 6 where you made --

 7     A    I understand, sir.

 8     Q    Now, just to make sure I'm clear, this initial

 9 conversation with Mr. Garland was on the same day that you

10 were first contacted by your brother and spoke to

11 Mr. Braun?

12     A    I think I made it crystal clear, sir, that as

13 soon as I got off the phone with my brother I contacted

14 Mr. Braun.  As soon as I got off the phone with Mr. Braun

15 I contacted Mr. Garland.

16     Q    Okay.

17     A    I don't know how I can make it clearer than

18 that.  If you can tell me, sir.

19     Q    That's all on the same day, correct?

20     A    I've answered the question.

21     Q    That's correct, right, it's all on the same day?

22     A    Yes.

23     Q    Thank you.  And that was the date that you

24 allege in your complaint that was on or about September

25 15th, right?
```

122

1    and he asked about attorneys for Mr. Jacobson, did you

2    consider any other Miami lawyers for Mr. Jacobson?

3         A    Yes.

4         Q    Who did you consider at that time?

5         A    I thought of Mr. Sonnet, Mr. Bierman,

6    Mr. Rothman.

7         Q    All well-known Miami attorneys, right?

8         A    Yes.

9         Q    Did you mention any of those names to Mr. Braun

10   as potential attorneys representing Mr. Jacobson?

11        A    No.

12        Q    When did you first learn that Mr. Garland had,

13   in fact, received some money for representing --

14             MS. SCHNEIDER:  Can we take a break real quick?

15             (Brief recess held.)

16   BY MR. CLEVELAND:

17        Q    When did you first learn that Mr. Garland had,

18   in fact, received some money for representing

19   Mr. Jacobson?

20        A    When I received a check in the mail.

21        Q    We've talked about some subsequent conversations

22   you had with Mr. Braun, a second and third conversation.

23   When was your next conversation with Mr. Garland?

24        A    Don't recall.

25        Q    Do you recall having any conversations with

123

1   Mr. Garland after your initial conversation with him

2   regarding Jacobson?

3       A    Don't recall.  I know I tried numerous times.

4       Q    You tried to call him several times?

5       A    Many times.

6       Q    Left messages with his firm?

7       A    Yes.

8       Q    You don't recall if he ever called you back?

9       A    Oh, he never called me back.

10      Q    You don't recall if you ever spoke to him after

11  that?

12      A    I do not recall if I spoke to him after that

13  time.

14      Q    Do you have any records of these attempted phone

15  calls to Mr. Garland?

16      A    No, other than of course it's alluded to in the

17  correspondence.

18      Q    When was the next conversation you had with

19  Mr. Jacobson, who you refer to as your client in the

20  complaint?

21      A    You've mischaracterized the testimony given.

22      Q    What part of my characterization is it that's

23  unfair, I'm sorry, or did I misstate?

24      A    You misstated.  Would you rephrase your

25  question?

124

1      Q    When was the next time, if any, you had a
2  conversation with Mr. Jacobson, who I believe you referred
3  to as your client in the complaint?
4      A    Mischaracterization is the word "next".
5      Q    All right.  Good point.  Did you ever have --
6  well, let me back up farther.  Did you ever have any
7  conversations with Mr. Jacobson regarding his case in the
8  Middle District of Florida?
9      A    Not that I recall.
10     Q    Did you ever attempt to call Mr. Jacobson?
11     A    Not that I recall.
12     Q    If you don't recall any conversations, is it
13  fair to say that you never discussed with Mr. Jacobson
14  your role in the case that you had agreed with, as you
15  say, with Mr. Garland?
16     A    Yes.
17     Q    Did you ever speak to Mr. Jacobson's wife?
18     A    Yes.
19     Q    Did you speak to her regarding this case alleged
20  in the complaint?
21     A    No.
22     Q    When was the last time you recall speaking to
23  Mr. Jacobson's wife?
24     A    I think it was after a death of a parent of the
25  Braun family.

128

1        Q      When you made the agreement you say you made

2   with Mr. Garland, you didn't follow that up with any kind

3   of a letter or memo to him outlining the nature of your

4   agreement with him, correct?

5        A      I'd have to look at the letters again to see.

6        Q      We'll go through those in a moment.

7        A      Okay.

8        Q      You indicated earlier, I think, that you have

9   referred cases to other lawyers?

10       A      Yes.

11       Q      And I think at one point you said something, it

12  was a common practice that after doing that you would

13  receive a copy of a retainer letter?

14       A      In some cases I've requested it, some cases I

15  have not.

16       Q      Have you ever entered into a written agreement

17  with another lawyer regarding sharing a client's fee?

18       A      No.

19       Q      Have you ever referred cases to other Georgia

20  lawyers --

21       A      Other what?

22       Q      -- other Georgia lawyers other than Mr. Garland

23  in this case as you've alleged?

24       A      Don't think so.

25       Q      Do you have any basis for any knowledge of what

130

```
 1   BY MR. CLEVELAND:

 2       Q    Mr. Marcus, I'm going to hand you a page that is

 3   copied --

 4            MS. SCHNEIDER:  I will assume you have copied it

 5       out of the Florida Rules of Court?

 6            MR. CLEVELAND:  2005 edition.  I have a whole

 7       book here.

 8       A    No, I trust this is an accurate copy.

 9       Q    What I've shown you is Page 1369 out of that

10   marked Exhibit 4, and Subsection G of Rule 4 --

11       A    Division of Fees Between Lawyers.

12       Q    Right.  Have you read that rule?

13       A    Yes.

14       Q    Do you believe it applies to your agreement with

15   Mr. Garland?

16       A    I haven't read it now, sir.  You asked me have I

17   read that rule.  May I read it now?

18       Q    You may read it now.

19       A    Thank you.

20            Your question, sir?

21       Q    Does this Rule 4-1.5(g) apply to your agreement

22   with Mr. Garland you say you have?

23       A    I believe all the Rules of Professional Conduct

24   would apply to whatever I do, sir.

25       Q    My question is is it your understanding that
```

132

1    Q    You can answer again.

2    A    I am governed by all of the Rules of

3    Professional Conduct.

4    Q    Was the agreement you made with Mr. Garland for

5    your one-third participation fee in proportion to the

6    services that you were to perform in the case?

7    A    It was up to Ed.  I did not limit what I would

8    do or what I would not do, and since he never provided the

9    agreement I do not know if he disclosed anything.  To this

10   day he has still not provided that copy.

11   Q    Disclosed anything, what do you mean?

12   A    He has not disclosed and provided a copy of his

13   fee agreement.  So I do not know, if you look at B, the

14   agreement fully discloses that a division of fees -- well,

15   that's not the one.  The agreement fully discloses that a

16   division of fees will be made.  How would I know if he did

17   that or not if he has not been kind enough to provide us

18   with a copy of the fee agreement to this day?

19   Q    You don't know if there was a written agreement

20   regarding the division of fees with Mr. Jacobson, whom you

21   identify as your client in the complaint?

22   A    I have been told that he signed a retainer

23   agreement.  Mr. Garland refers to one, but I do not know

24   the contents thereof.

25   Q    As part of your agreement with Mr. Garland

1    regarding representation of Mr. Jacobson, were you to

2    assume joint legal responsibility for the representation

3    and agreed to be available for consultation with

4    Mr. Jacobson?

5         A    Yes.

6         Q    What was your legal responsibility for the

7    representation of Mr. Jacobson?

8         A    Whatever Mr. Garland required.

9         Q    Do you have an understanding about whether your

10   agreement with Mr. Garland violated the Rules of

11   Professional Conduct in Florida or not?

12        A    Yes.

13             MS. SCHNEIDER:  Let me object to the form of the

14        question.

15        Q    What's your understanding?

16        A    You said do I have an understanding.  My

17   understanding, that it did not violate.

18        Q    What do you base that understanding on?

19        A    That I was willing, ready, willing and able to

20   do everything that the rule states and was prohibited from

21   doing so by Mr. Garland.

22        Q    You don't have any understanding about whether

23   Mr. Jacobson signed any written agreement, right?

24        A    Incorrect.

25             MS. SCHNEIDER:  Objection, asked and answered.

134

1      Q     I'm sorry, you do have an understanding about

2   whether Mr. Jacobson signed a written agreement

3   consenting --

4      A     No.  That's not what the question was.

5      Q     That's true.  I'll rephrase it.  Do you have any

6   understanding about whether Mr. Jacobson signed any

7   agreement consenting to a division of fees?

8      A     I have no understanding.

9      Q     Did you ever have any discussion with anybody

10  about whether Mr. Jacobson knew about or consented to you

11  being paid a one-third fee for his representation?

12     A     Yes.

13     Q     Who did you speak to?

14     A     Mr. Braun.

15     Q     And what did Mr. Braun tell you about what

16  Mr. Jacobson said?

17     A     I don't think that was the question.

18     Q     What did Mr. Braun tell you regarding

19  Mr. Jacobson's understanding that you were obtaining a

20  one-third participation fee?

21     A     Mr. Braun advised that he understood that I

22  would be receiving remuneration, a participation fee from

23  Mr. Garland.  He expected, Mr. Jacobson expected that

24  and -- not as to the specifics.

25     Q     Did Mr. Braun ever indicate to you that

1    Q    And why did you do that?

2    A    To find out what was happening, if there was

3 anything else other than what I was seeing in The Miami

4 Herald or The Sun Sentinel.

5    Q    And how did this apply to the representation of

6 Mr. Jacobson in this case?

7    A    Looking for anything that may give information

8 to Mr. Garland, who was lead counsel in the case.

9    Q    Did someone direct you to do this?

10   A    Yes.

11   Q    Who directed you to do this?

12   A    Mr. Garland directed that I keep him advised of

13 whatever I could find out what was happening.

14   Q    And this was in September of '01, correct?

15   A    That is correct.

16   Q    So part of the obligations he had asked you to

17 do at that time was to do searches of newspaper articles

18 to find out what was happening?

19   A    My interpretation of that was to search the

20 newspapers, search whatever I could, give him whatever

21 information I could as to what was happening.

22   Q    Other than the letter you sent, searching for

23 newspaper articles and discussions with Mr. Klein and

24 Mr. Braun, was there anything else you did to participate

25 in representing Mr. Jacobson in the case referred to in

1  the complaint?

2      A    I said I also spoke to Mr. Klein, now Judge

3  Klein.

4      Q    Anything else?

5      A    Not that I recall.

6      Q    What did you do in speaking to Mr. Klein to

7  assist in representing Mr. Jacobson?

8      A    As I said before, sometimes somebody says

9  something that may be helpful.  Nothing in particular.

10      Q    Did you keep track of the number of hours you

11  spent doing these activities?

12      A    No, sir.

13      Q    Do you have any idea of roughly how many hours

14  you spent doing it?

15      A    No.  Nobody asked me that until you just did

16  now, so I have no idea, sir.

17      Q    Would you say it's more than ten hours?

18      A    Yes, sir.

19      Q    More than 50 hours?

20      A    Sir, I do not know, sir.

21      Q    As you sit here today you can't give an estimate

22  of how many hours you spent participating in

23  Mr. Jacobson's representation?

24      A    I have no estimate at this time, sir.

25      Q    Is there any way you could make such an

1    estimate?

2        A    I don't know.

3        Q    You didn't keep records of time you spent on the

4    matter, did you?

5        A    No, sir.

6        Q    Let me refer you to what was marked as Exhibit

7    Number 3, the complaint filed on your behalf, please.

8        A    One moment, please.

9            (Discussion off the record.)

10   BY MR. CLEVELAND:

11       Q    Referring to what was marked as Exhibit 3, the

12   complaint filed in this case, Paragraph Number 9.

13       A    Paragraph 9.

14       Q    It's alleged that, "Upon information and belief,

15   Plaintiff's client paid defendants in excess of $150,000

16   to represent Plaintiff's client in the subject federal

17   court action."  Do you see that?

18       A    Yes, I see what it says, sir.

19       Q    Upon what information and belief did you base

20   the allegation that Mr. Jacobson had paid Mr. Garland in

21   excess of $150,000?

22           MS. SCHNEIDER:  For the record, this was filed

23       by Mr. Marcus' attorney.  It's signed by Mr. Marcus'

24       attorney, not him.

25       Q    Okay.  You can answer the question.

181

1

2                         CERTIFICATE OF OATH

3

   STATE OF FLORIDA        )

4

5  COUNTY OF DADE           )

6

7           I, the undersigned authority, certify that

8  PAUL R. MARCUS personally appeared before me and was

9  duly sworn on February 3, 2006.

10

11          Witness my hand and official seal this

12 18th day of April 2006.

13

14                         _____

15                         JENNIFER D. BELZ

16                         Notary Public - State of Florida

17                         My Commission #DD061892

18                         Expires: October 23, 2009

19

20

21

22

23

24

25

EXHIBIT 4

IN THE COUNTY COURT OF THE
11TH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY,
FLORIDA

CIVIL DIVISION

CASE NO. **05 - 7 7 4 5**   **CA 1 5**

PAUL R. MARCUS,  )
    Plaintiff,  )   COMPLAINT FOR BREACH OF
      )   CONTRACT
      )
vs  )   Fla. Bar No. 96581
      )
GARLAND, SAMUEL & LOEB, P.C. and  )
EDWARD T. M. GARLAND,  )
      )
    Defendants.  )

Plaintiff, PAUL R. MARCUS, sues Defendants, GARLAND, SAMUEL & LOEB, P.C. and

EDWARD T.M. GARLAND, and states as follows:

    1.    This is an action for damages in an amount greater than $15,000.00, exclusive of

interest, costs and attorney's fees.

    2.    Plaintiff, PAUL R. MARCUS, is an attorney licensed to practice in the State of Florida

and a resident of Miami-Dade County, Florida.

    3.    Defendant, GARLAND, SAMUEL & LOEB, P.C., is a law firm in the State of Georgia

subject to the jurisdiction of this Court pursuant to Florida Statutes §48.193, by, *inter alia*,

representing a client referred to Defendant by Plaintiff in an action pending in the state of Florida.

Furthermore, venue is proper in Miami-Dade County because the Defendant breached the

agreement with Plaintiff in Miami-Dade County, Florida.

    4.    Defendant, EDWARD T.M. GARLAND is an attorney licensed to practice law in the

State of Georgia subject to the jurisdiction of this Court pursuant to Florida Statutes §48.193, by,

*inter alia*, representing a client referred to Defendant by Plaintiff in an action pending in the state

of Florida.  Furthermore, venue is proper in Miami-Dade County because the Defendant breached

the agreement with Plaintiff in Miami-Dade County, Florida to Defendants for representation.

    5.    On or about September 15, 2001, Plaintiff referred a client facing prosecution in the

United States District Court in and for the Middle District of Florida.

    6.    At the time Plaintiff referred his client to Defendants, it was agreed that Plaintiff

CASE NO

would participate in the client's legal representation in the federal case.

7.   At the time Plaintiff referred his client to Defendants, it was agreed that Plaintiff's participation fee would be one-third of the fee Plaintiff's client paid to Defendants.

8.   Attached hereto is a copy of Defendants' letter to Plaintiff dated September 24, 2001, confirming Plaintiff's referral of his client to Defendants and transmitting Plaintiff's initial participation and referral fee of $5,000.00.

9.   Upon information and belief, Plaintiff's client paid Defendants in excess of $150,000.00 to represent Plaintiff's client in the subject federal court action.

10.   Despite receiving in excess of $150,000.00 from Plaintiff's client for the representation, Defendants have failed and refused to pay Plaintiff the agreed upon participation and referral fee over and above the initial $5,000.00.

11.   Plaintiff has been damaged as a result of Defendants' breach in an amount in excess of $15,000.00, representing the balance of the agreed upon participation and referral fee which Defendants have failed to pay Plaintiff, exclusive of interest, costs and attorney's fees.

12.   Plaintiff has been required to retain the undersigned law firm to represent him in connection with this cause and is obligated to pay his attorneys a reasonable fee for their service in connection herewith.

WHEREFORE, Plaintiff, PAUL R. MARCUS, demands judgment against Defendants, GARLAND, SAMUEL & LOEB, P.C and EDWARD T.M. GARLAND, jointly and severally, for compensatory damages, costs, expenses, prejudgment interest, reasonable attorney's fees pursuant to Florida Statutes §57.105, there being no justiciable issue of law or fact, and such further relief as the Court deems proper.

LEVEY, AIRAN, SHEVIN, ROEN,
KELSO, CORONA & HERRERA, LLP
Gables One Tower, Penthouse
1320 South Dixie Highway
Coral Gables, Florida 33146
(305) 661-6664 (Telephone)
(305) 661-6477 (Facsimile)

By: _____
LINLEY B. SCHATZMAN

N:\1835\0001\Complaint.wpd[3/31/ 2005 6:01 pm]

-2-

# EXHIBIT "A"

SENT BY: ED GARLAND;                    4042829947;          MAY-18-05 11:09AM;          PAGE 9/9

# Garland, Samuel & Loeb, P.C.
TRIAL ATTORNEYS

3151 Maple Drive, N.E.
Atlanta, Georgia 30305
Telephone (404) 262-2225
Facsimile (404) 365-5041
E-mail trislaw@atlanta.com

September 24, 2001

Edward T. M. Garland
Donald F. Samuel
Robin N. Loeb
Anne H. Coolidge-Kaplan
Jana Lauren Harris
Nelson O. Tyrone III
Samuel L. Starks

Reuben A. Garland (1903-1982)

Paul R. Marcus, Esquire
Marcus Centre – Penthouse One
9990 S.W. 77th Avenue
Miami, Florida 33156-2699

Dear Paul:

Thank you for referring Jerry Jacobson to me. Enclosed is a check from my firm in the amount of $5,000.00 for your role in this case. I apologize for not promptly returning your call. The prosecutor is seeking a plea to 3 counts of the indictment. A total of 40 people are expected to be indicted, most of them testifying against Jerry.

The discovery is voluminous, including 130 hours of conversations pursuant to a federal wiretap. We are examining the legitimacy of the wiretap and the compliance with the minimization requirements. In addition, Jerry confessed. There is a question, however, about the voluntariness of his confession.

Thank you again for your referral.

With kindest regards, I am

Sincerely yours,

Edward T. M. Garland

ETMG/ph
Enclosure

EXHIBIT 5

STATE OF GEORGIA
COUNTY OF GWINNETT

## AFFIDAVIT OF LINDA JACOBSON

LINDA JACOBSON being first duly sworn, states as follows:

1. I am a resident of Lawrenceville, Georgia.

2. I have personal knowledge of the facts stated herein.

3. I am the wife of Jerome ("Jerry") Jacobson. He was a defendant in the lawsuit styled

USA v. Jacobson, et al., Case number 3:01-cr-00251-HLA-MCR-1.

4. My husband was arrested in this case on August 21, 2001.

5. I assisted in arranging for a bond to be posted for my husband. He was released the

following day, on August 22, 2001.

6. Following my husband's arrest, I developed a list of possible attorneys to represent my

husband, based on local reputation. The list included Ed Garland and Bruce Harvey. I discussed

these names with my husband when he was released. Jerry commented that he had heard about

Mr. Garland.

7. Later that day, we met with Jerry's step-brother, Marvin Braun, who lives in Miami.

Marvin told us that he had learned of an Atlanta attorney, Ed Garland, who was highly

recommended. He did not mention Paul Marcus' name. We told Marvin we had heard of Mr.

Garland as well. Marvin made arrangements for us to meet with Mr. Garland the following day.

8. We met with Mr. Garland the following day. We initially contacted Mr. Garland to

represent my husband. However, when we later learned that the prosecutor was considering

charging me as well, we retained Mr. Garland and his firm to represent me also, and the payment

we made to Mr. Garland's firm encompassed both of these representations.

9. Based on our initial conversations with Mr. Garland, I expected the case to last more than a year. I recall a conversation where I asked if the matter might be concluded by my husband's next birthday, and remember being told we would be lucky if it was concluded by not his next birthday, but the birthday after that.

10. I do not know Paul Marcus. I may have met him, but I do not recall it. I have never been his client. If I have ever spoken to him; I did not speak to him at any time after my husband was arrested. He has never tried to contact me that I know of.

11. I was never told by anyone about any agreement involving Mr. Marcus sharing fees we paid to Mr. Garland's law firm, or about his participating in representing my husband or me. There was never any discussion I participated in where Mr. Marcus' name was discussed in conjunction with my husband selecting Mr. Garland. The first I learned that Mr. Marcus was claiming he had an agreement to share fees was after Jerry's case was over.

_Linda Jacobson_
Linda Jacobson

The foregoing instrument was [sworn to and subscribed] [acknowledged before me] this _5th_ day of May, 2006 by Linda Jacobson, who is personally known to me or who has produced _Drivers License_ as identification.

_Laura L. Klemenc_
Signature of Notary

Print Name: _Laura Klemenc_
NOTARY PUBLIC, STATE OF GEORGIA

Commission No. _03-NT-02853_
My Commission Expires: _8/25/07_

**La   a L Klemenc**
**561 Sletten Drive**
**Lawrenceville, GA 30045**

Page 2